**In re Joseph A. OCHS, Debtor.**

No. 801–84705–478.

United States Bankruptcy Court,
E.D. New York.

Sept. 25, 2002.

Westermann Hamilton Sheehy, Aydelott & Keenan, LLP, by Christopher J. Sheehy & Stephen J. Gilespie, Garden City, New York, for Kellogg Marine, Inc.

Lester & Fontanetta, P.C., by Roy J. Lester, Garden City, New York, for the debtor.

Marianne DeRosa, Jericho, New York, Chapter 13 Trustee.

**MEMORANDUM DECISION OVERRULING KELLOGG MARINE, INC.'S OBJECTION TO THE CONFIRMATION OF THE DEBTOR'S CHAPTER 13 PLAN**

DOROTHY EISENBERG, Bankruptcy Judge.

This contested matter concerns an objection filed by Kellogg Marine, Inc. ("Kel-

logg") to confirmation of Joseph A. Ochs' (the "Debtor's") Chapter 13 plan on the basis of 11 U.S.C. § 1325(a)(3). According to Kellogg, the Debtor's plan was not filed in good faith due to his allegedly fraudulent prior conduct with Kellogg. For the reasons set forth below, Kellogg's objection is overruled and there is no bar to the Debtor confirming a properly filed Chapter 13 plan. The following constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

FACTS

Prepetition, the Debtor was the president of Thrift Mart Marine ("Thrift Mart"), a marine supply store located 701 Middle Country Road, Selden, New York. On or about January 13, 1996, the Debtor, as president of Thrift Mart, completed a credit application prior to opening a credit account with Kellogg, a marine goods wholesaler. In addition to this credit application, the Debtor, in his capacity as President of Thrift Mart, executed a Sales Contract (the "Contract") and also executed a guarantee, personally guaranteeing any debt on the account of Thrift Mart (the "Guarantee"). Pursuant to the Contract, the Debtor and Thrift Mart agreed that title to all goods sold on credit would remain in Kellogg until payment by Thrift Mart was complete. The Debtor and Thrift Mart agreed to payment terms pursuant to the Contract. In addition, should the account be referred to an attorney for collection, the costs of collection would be paid in addition to the balance owed.

On October 27, 2000, the Debtor received notice from the owner of the property upon which Thrift Mart operated that the Thrift Mart lease would not be renewed in January, 2001. Pursuant to an order placed in November, 2000, $20,590.49 of marine goods were ordered by Thrift Mart and delivered from Kellogg between January 29, 2001 and March 12,

2001. No payments were made by Thrift Mart for these shipped goods. On March 18, 2001, an advertisement appeared in Newsday announcing a public auction of marine and boating trailer supplies, to take place on March 19, 2001 at the Thrift Mart premises. Included in the auction were goods shipped by Kellogg for which Thrift Mart had not made payment. Prior to the scheduled auction, an employee of Kellogg unsuccessfully tried to contact Thrift Mart, and thereafter, Kellogg discovered that Thrift Mart was no longer operating. At or about the same time, the Debtor obtained employment as a boat salesman.

On April 17, 2001, Kellogg commenced a civil action against Thrift Mart and the Debtor, seeking judgment against Thrift Mart and the Debtor for goods sold by Kellogg. The Debtor filed a petition for relief under Chapter 13 of the Bankruptcy Code on June 11, 2001. Kellogg is listed as an unsecured creditor on Schedule F of the Debtor's petition. Kellogg filed a claim in the amount of $20,590.49 for goods sold to the Debtor. The Debtor lists a total of $230,695.39 in unsecured debt, inclusive of the claim of Kellogg. A large portion of the unsecured debt appears to be based on the Debtor's guarantees of Thrift Mart's obligations. The Debtor's Chapter 13 plan was filed on June 11, 2001, and was amended on September 27, 2001. The Debtor filed a second amended plan on July 23, 2002, which reflects a downward modification in plan payments due to the Debtor's change in employment from boat salesman to employee at Network Educational Tech. Under the second amended plan, the Debtor is to make 60 monthly payments, with monthly payments in the amount of $583 for the first three months, $747 for the next seven months and $326 for the 48 remaining months. The Debtor's plan as amended contem-

plates payments totaling $22,626. Unsecured creditors filing timely proofs of claim are to receive a pro rata distribution. The Debtor estimates that unsecured creditors will receive approximately 8% on their claims.

On September 30, 2001, Kellogg filed an objection to Confirmation of the Debtor's Chapter 13 Plan, claiming only that the debt owed to Kellogg is nondischargeable under sections 523(a)(2) and (a)(6) of the Bankruptcy Code, and therefore the Debtor's plan was not filed in good faith. The Debtor filed a reply on September 25, 2001, and the Court took testimony from the Debtor on June 20, 2001. The Debtor testified that he retained an auction firm to schedule an auction of the inventory and equipment in Thrift Mart's possession because he was unable to obtain credit from Bombardier Capital ("Bombardier"), which had been providing financing for the boat trailers sold by Thrift Mart. According to the Debtor, without financing from Bombardier, Thrift Mart could no longer sell boat trailers which had provided Thrift Mart with a major source of income.

Thrift Mart quickly retained an auctioneer and the Debtor testified that Thrift Mart auctioned inventory worth $115,000 plus computer equipment. According to the Debtor he expected to obtain a return of $35,000 to $40,000 and planned on repaying creditors of Thrift Mart, which were owed an aggregate of approximately $125,000, a portion of what was owed to each of them. Instead of receiving the expected amounts from the auction, Thrift Mart received approximately $15,000, which could cover only a fraction of its debt. The auction proceeds were used to pay outstanding New York State sales tax, payroll obligations, professional fees and ongoing expenses for the store.

As a result of the paltry returns garnered from the auction, Thrift Mart had insufficient funds to repay Kellogg, Bombardier, which was owed over $75,000 or any other remaining creditor. A majority of the creditors of Thrift Mart had personal guarantees from the Debtor, and after closing the store, the Debtor filed this petition under Chapter 13 of the Bankruptcy Code. The Court found the Debtor's testimony to be truthful and credible as to the events and circumstances surrounding the auction and the decision to file this petition.

DISCUSSION

■ Pursuant to section 1325(a)(3) of the Bankruptcy Code, the Court shall confirm a plan under Chapter 13 if, *inter alia,* it "has been proposed in good faith and not by any means forbidden by law." The Bankruptcy Code does not define what constitutes good faith, and the Court must make its own determination with regard to whether the Debtor's plan was proposed in good faith. *In re Corino,* 191 B.R. 283, 288 (Bankr.N.D.N.Y.1995) (citing, *inter alia, In re Smith,* 848 F.2d 813, 819 (7th Cir.1988); and *In re Schaitz,* 913 F.2d 452 (7th Cir.1990)). A number of courts have noted that it is the plan which must be proposed in good faith, not that the debts be incurred in good faith. *In re Klevorn,* 181 B.R. 8, 10 (Bankr.N.D.N.Y.1995); *In re Schaitz,* 913 F.2d at 455–456. The Court of Appeals for the Second Circuit has determined that a finding of good faith requires "honesty of intention" by the debtor in question. *Johnson v. Vanguard Holding Corp. (In re Johnson),* 708 F.2d 865, 868 (2d Cir.1983).

In view of the fact that "good faith" is not defined in the Bankruptcy Code, various courts have employed a totality of circumstances test to determine whether a plan has been proposed in good faith, which requires an inquiry into all relevant circumstances of a case to determine whether "the proposed plan constitutes an

abuse of the provisions, purpose or spirit of Chapter 13." *In re Wilheim*, 29 B.R. 912, 914 (Bankr.D.N.J.1983). The factors which courts have employed to make such a determination include:

(1) the probable duration of the plan,

(2) the frequency of bankruptcy filing,

(3) the accuracy of the bankruptcy papers,

(4) the debtor's motivation and sincerity of Chapter 13 filing,

(5) the creditors,

(6) the circumstances of incurring debt,

(7) the nature and quantity of unsecured debt,

(8) if the debt was otherwise nondischargeable,

(9) the amount of attorneys fees,

(10) the burden of administration,

(11) special circumstances like medical costs,

(12) the debtor's degree of effort,

(13) the debtor's ability to earn,

(14) the debtor's employment history and likelihood of future raises,

(15) the percentage of debt repayment,

(16) the amount of proposed payments,

(17) the amount of budget surplus,

(18) the general tests of "fundamental fairness", "totality of circumstances" and "honesty of intention."

*In re Sutliff*, 79 B.R. 151, 153 (Bankr. N.D.N.Y.1987) (citing *Nelson v. Easley (In re Easley)*, 72 B.R. 948, 950–55 (Bankr. M.D.Tenn.1987); *Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir.1986); and *In re Makarchuk*, 76 B.R. 919, 922–24 (Bankr. N.D.N.Y.1987)).

 In sum, courts undertake a broad inquiry to determine " 'whether or not under the circumstances of the case there has been an abuse of the provisions, purpose or spirit of [the chapter] in the proposal.' " *In re Sutliff*, 79 B.R. at 154 (citing *Kitchens v. Georgia Railroad Bank & Trust Co. (In re Kitchens)*, 702 F.2d 885, 888 (11th Cir.1983)). In this case, the Debtor owes approximately $230,695.39 in unsecured obligations and he proposes to pay the unsecured claims approximately 8% over five years. The Debtor's current monthly net income is $2100, and his monthly expenses are $1766.94. Of the $333.06 in excess income per month, the Debtor plans to devote $326 per month to the plan payments. Although an 8% payout to unsecured creditors is not substantial, the Debtor does appear to be devoting all of his excess income to the plan at the cost of foregoing monthly entertainment and clothing expenses and by keeping his medical costs to $15 per month. The Court cannot conclude that the Chapter 13 plan as amended has been proposed in bad faith. *See In re Metz*, 820 F.2d 1495, 1498 (9th Cir.1987) (Chapter 13 plan which requires debtor to apply all projected disposable income to plan payments, yet provides for no payment to unsecured creditors does not warrant a finding the plan was submitted in bad faith *per se*).

 In scrutinizing the Debtor's motivation and sincerity in filing the Chapter 13 petition, the Court is obligated to review the debts the Debtor is seeking to discharge and to determine whether the timing of the filing or any other factor indicates an attempt to abuse the provisions of Chapter 13 of the Bankruptcy Code. In doing so, the Court can take into consideration the fact that Kellogg asserts that its debt is nondischargeable under section 523(a)(2) and/or (6) of the Bankruptcy Code. The Debtor's overall unsecured debt reflects poor financial management in that approximately 90% of the debt is comprised of credit card debt. The

debt owed to Kellogg by virtue of the Debtor's personal guaranty would most likely be dischargeable in a Chapter 7 case because there is insufficient evidence that the Debtor intended to defraud Kellogg by inducing Kellogg to sell the goods to Thrift Mart. The Debtor's testimony at the evidentiary hearing, which the Court found to be credible, supports a finding that the Debtor sold the goods purchased from Kellogg with the intent of repaying creditors as much as possible, but that the sale did not generate sufficient funds to repay Kellogg. The Debtor did not apply the funds collected from the sale to repay his own personal obligations, but used the funds to repay creditors of Thrift Mart. In addition, although Kellogg asserts that the Debtor converted Kellogg's goods, no evidence was produced at the evidentiary hearing that Kellogg retained a perfected security interest in the goods once they were shipped to Thrift Mart. Under New York law, the filing of appropriate UCC–1 financing statements is required to evidence that a party has been granted a security interest in goods. Furthermore, the fact that Thrift Mart received a notice of cancellation of its lease, without more, is not dispositive on the issue of fraud vis-a-vis Kellogg. There is no evidence that the Debtor never intended to repay Kellogg or that the Debtor fraudulently induced Kellogg to ship goods to Thrift Mart. Without such a finding, Kellogg would not prevail in an action against the Debtor pursuant to § 523(a)(2) of the Bankruptcy Code.

Likewise, no evidence was adduced that the Debtor acted willfully or maliciously to injure Kellogg in requesting shipment of goods from Kellogg. Without a finding of intent to harm or defraud Kellogg, any cause of action against the Debtor pursuant to § 523(a)(6) would fail as well.

Even if the debt owed to Kellogg was deemed to be nondischargeable, this would not, in this case, be sufficient to result in denial of confirmation of the Debtor's plan. Cases which find that the existence of one debt is sufficient to make a finding that the debtor in question violated section 1325(a)(3) usually concern a debt which dwarfs the other unsecured debts and which involves criminal conduct. In the case of *In re Sotter*, 28 B.R. 201 (Bankr. S.D.N.Y.1983), the Bankruptcy Court found that a debtor, who was a bank branch manager and pled guilty to making false statements to induce a federally insured bank to issue loans, did not file his petition under Chapter 13 in good faith. The court looked at a variety of factors, and based its decision mainly on the existence of the claim of the bank which was reduced to a civil judgment. As the court noted:

> When the genesis of the major obligation sought to be wiped out under a Chapter 13 plan is rooted in criminal conduct, the courts must be more circumspect in weighing the crucial issue of good faith. This point was emphasized by the Sixth Circuit in the *Memphis Bank & Trust Company case*, supra, [*v. Whitman,*] 692 F.2d [427] at page 432 [(6th Cir.1982)] as follows:
>
> > 'We should not allow a debtor to obtain money, services or products from a seller by larceny, fraud or other forms of dishonesty and then keep his gain by filing a Chapter 13 petition within a few days of the wrong.'

28 B.R. at 204.

Other courts have recognized that the debtor's decision to file the Chapter 13 petition must be seen as part of an overall scheme to avoid paying a debt procured by fraud. "The nature of the debt itself cannot preclude a Chapter 13 filing unless the debt was fraudulently incurred without any intention of repayment because of an anticipated abuse of the Chapter 13 pro-

cess." *In re Chase,* 43 B.R. 739, 743–44 (D.Md.1984) (citing *Margraf v. Oliver,* 28 B.R. 420 (Bankr.S.D.Ohio 1983)).

In the case before this Court, there has been no finding that the Debtor fraudulently induced Kellogg to ship goods to Thrift Mart with the intention of never repaying Kellogg, or that the filing of this petition is all part of a scheme by the Debtor to dispose of one of his largest obligations. Rather, it appears that the Debtor intended to have an auction sale of goods conducted at Thrift Mart to repay creditors, including Kellogg, and that the sale fell short of his expectations. The Debtor is making an attempt to repay the unsecured creditors in this case despite his meager income.

All the remaining factors considered fail to sustain a finding that this petition was filed in bad faith. The Debtor is proposing a plan over five years when he could have only dedicated three years' worth of his disposable income to a plan, and this is the Debtor's first filing. The Debtor is not seeking to prefer one creditor over the other creditors, and overall, the Debtor's demeanor at the hearing supports a finding that the petition was not filed in bad faith. For the foregoing reasons, this Court finds that the Debtor has complied with section 1325(a)(3) of the Bankruptcy Code and this petition was filed in good faith.

CONCLUSION

1. The Bankruptcy Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334.

2. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A) and (L).

3. Based on the evidence presented, including the testimony and demeanor of the Debtor, the Court concludes that the Debtor did not intend to defraud Kellogg

when Thrift Mart accepted Kellogg's merchandise for resale after January, 2001.

4. The Debtor's Chapter 13 plan complies with 11 U.S.C. § 1325(a)(3) in that the plan has been proposed in good faith and is not by any means forbidden by law. The Debtor's decision to file a petition for relief under Chapter 13 was not part of a larger scheme to defraud Kellogg, but was the result of the Debtor's poor financial situation.

Settle an order in accordance with this decision within ten (10) days hereof.